IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

JOHN BRANSON,

    Plaintiff,

v.                                                        No.: 2:08-cv-02804

HARRAH'S TUNICA CORPORATION,
ET AL.

    Defendants.

**MEMORANDUM OPINION AND ORDER**

This matter came before the Court for a non-jury trial, which was held December 20-21, 2010. Plaintiff John Branson ("Plaintiff") brought claims of sex discrimination under Title VII of the 1964 Civil Rights Act, 42 U.S.C. §§ 2000e et seq. ("Title VII"), and age discrimination under the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 et seq. ("ADEA"), against Defendants Harrah's Entertainment, Inc. ("HET") and Harrah's Operating Company, Inc. ("HOC") (collectively "Defendants").[1] After considering the testimony of the witnesses, weighing the credibility of those witnesses, considering the exhibits, the applicable case law and Rules, and the parties' proposed findings and conclusions, the Court makes the following findings of fact and conclusions of law.

**I. FINDINGS OF FACT**

---

[1] At trial, Plaintiff waived his claim under Title VII for sexual discrimination.

Plaintiff began working in the casino industry in Nevada in the 1970s. He worked at casinos in Biloxi and Vicksburg, Mississippi, before commencing work as a pit manager at the Grand Casino ("the Grand") in Robinsonville, Mississippi, in June 1996.[2] Plaintiff worked at the Grand until March 16, 2007, when he resigned in lieu of being terminated. During his employ at the Grand, Plaintiff received a promotion every few years, first from pit manager to relief manager, then to assistant shift manager, and finally to table games shift manager in 2005. As a table games shift manager, Plaintiff supervised up to 100 employees. Prior to the events that resulted in his resignation, Plaintiff had never been disciplined at the Grand and had received above-average evaluations and annual pay raises.[3]

The parties dispute whether Defendants were Plaintiff's employers when he worked at the Grand. Plaintiff testified that BL Development ("BLD") owned the Grand in 1996 but that he was advised by letter in 2006 that HET and HOC had acquired Caesar's Entertainment, Inc. ("Caesar's"), Caesar's subsidiary Grand Casino's, Inc. ("GCI"), and GCI's subsidiary BLD, which directly owned the Grand. Plaintiff testified that he had no further contact with BLD after being notified that HET and HOC had acquired the Grand. Plaintiff received an HOC employee handbook, and his 2006 and 2007 W-2s, which were admitted into evidence, list HOC as his employer.

LinkedIn is a professional networking website. The LinkedIn profile pages of Darrell Pilant, the Grand's Vice President of Operations, and Tammy Young, the Human Resources Manager, were introduced into evidence. Both Pilant and Young's profile pages list "Harrah's

---

[2] Sometime within the past five years, the name of this property changed to "Harrah's Casino and Hotel."

[3] Plaintiff's 2003 through 2007 federal and state income tax returns show Plaintiff's annual gross incomes as follows: $73,869.00; $74,249.00; $78,179.00; $79,850.00; $66,466.00.

Entertainment" as their employer. Although Young testified that the employees at the Grand worked for "the property," she admitted on cross-examination that "HOC" is listed on the Grand's W-2 forms and its employee handbook. Further, Pilant testified that "Harrah's" oversaw all of the properties where he had worked.[4]

In March 2007, the Grand employed three table games shift managers, Plaintiff, Rob Keene, and Denise Alford, each of whom reported directly to Pilant. Each of these managers was assigned an individual computer log-in, password, and Windows account. On March 8, 2007, Plaintiff sat down to use a shared, work computer when he noticed an email from Alford to Pilant. Alford had apparently failed to log out of her email account, and the email appeared on the screen when Plaintiff touched the mouse. The email stated that Plaintiff and Keene were speaking in front of Mitch Pate, a pit manager, about the performance of one of Plaintiff and Keene's subordinates. Plaintiff became angry because, as he maintained at trial, this statement was untrue.[5] Approximately two hours into his shift, Plaintiff forwarded a copy of Alford's email first to his business email account and then to his personal email account so that he could access the email from home.

Alford notified Pilant that Plaintiff had forwarded the email, and Pilant asked Alford to print the email for him, which she did. Pilant subsequently asked the IT Department to investigate the matter and give him access to Plaintiff's business email account, which it did. On March 15, 2007, Pilant and Plaintiff met in private for approximately ten minutes, and, when

---

[4] At the time of trial, Pilant was the Vice President and Assistant General Manager of Harrah's North in Kansas City, Missouri. In addition to the Grand, he had previously worked at Margaretteville in Biloxi, Mississippi, which is also a Harrah's property.

[5] At trial, Alford testified that the content of the email was true. The Court finds that resolution of this fact is immaterial to the issues before it because Defendants allege that they terminated Plaintiff solely for violating the Grand's computer policy. Furthermore, Pilant conceded at trial that he did not recall conducting an investigation into the content of the email.

3

asked, Plaintiff admitted to forwarding the email to his personal account. Pilant responded that Plaintiff had violated several policies and the trust that Pilant had placed in him. Pilant told Plaintiff that he would think about what to do and get back with him. Pilant admitted at trial, however, that he had made up his mind at that point to give Plaintiff the option of resigning effective immediately or being terminated.

Later that same day, Plaintiff wrote Pilant an email explaining that Alford's email had upset him because it contained untrue statements. Plaintiff's email then states, "It was a mistake on my part to forward something from her e-mail to mine rather than just logging out and discussing it with her and you." On March 16, 2007, Pilant and Plaintiff met again in private. Pilant reiterated that Plaintiff's forwarding of the email violated company policies and the trust that Pilant had placed in him. Plaintiff resigned in lieu of being terminated on March 16, 2007. His termination report states that he resigned by mutual agreement and designates him "eligible for rehire."

Pilant testified that this action was taken because of Plaintiff's unauthorized use of the Grand's computer system and because he could not trust Plaintiff after this incident. Pilant acknowledged that Plaintiff had otherwise been a good and loyal employee and was qualified to be a table games shift manager. He further testified that he offered Plaintiff the option of resigning and designated him "eligible for rehire" so that it would be easier for Plaintiff to find subsequent employment. Young approved Plaintiff's resignation but did not converse with Plaintiff or Pilant regarding the circumstances surrounding Plaintiff's resignation. She testified that when an employee commits a serious infraction, his or her termination report shows that the

employee is not eligible for rehire. Both Pilant and Young testified that they did not know or care about Plaintiff's age.

Plaintiff claims that he was forced to resign because of his age. At the time of his resignation, Plaintiff was fifty-eight years old. He was replaced by Pate, who was in his mid-thirties. Pilant had inquired as to Plaintiff's age at a meeting of supervisors approximately six months prior to Plaintiff's resignation. Furthermore, Plaintiff had substantial experience disciplining employees and was unaware of an employee who had been terminated for a first infraction that did not involve theft or violence. In his experience, the Grand followed a four step disciplinary process: 1) verbal warning; 2) written warning; 3) final written warning; and 4) termination. Young also attested to this four step disciplinary process but maintained that employees had been terminated upon a first infraction not involving theft or violence and that disciplinary decisions were based on a variety of factors.

Evidence was also introduced regarding the policies that Plaintiff allegedly violated. Defendants first allege that Plaintiff violated provisions of the Grand's employee handbook, which state that employees will "use professional judgment," "obey all company rules," and will use Company e-mail . . . only for authorized business according to Computer Usage Policy." In addition to these general standards of conduct, Defendants cite a form entitled "Standards for use of the Park Place Entertainment Corporation Computer System." ("Standards for Use form") On March 21 and April 14, 2001, Plaintiff signed copies of this form, which mandates as follows:

> [a]ll data of any nature that are entered or received through your Company computer including all E-mail messages are and will remain the property of the Company. None of those data or messages may be used for any purposes not related to the business of the Company, nor may they be sold transmitted, conveyed or communicated in any way to

5

anyone outside the Company without the express written authorization of an officially designated Company representative.

Although Defendants submitted Plaintiff's signed copies of the Standards for Use forms in response to the EEOC Charge, Pilant stated that he had never signed any computer usage document and could not recall the specific policies that Plaintiff allegedly violated. Similarly, Alford testified that she had never seen a Standards for Use form and was unaware of these particular standards. Alford went so far as to state that, to her knowledge, the Standards for Use policies that Plaintiff received in 2001 were not in effect in 2007. Finally, Plaintiff testified without contradiction that employees did not receive training or instructions regarding the forwarding of e-mails or use of the Grand's computer system.

The proof also showed that employees occasionally accessed each other's email accounts on the shared, work computer and that such conduct was not considered a violation of company policy. In 2006, for example, Plaintiff discovered that Alford, who at the time was an assistant table games shift manager, was sorting through the emails of Andrew Christou, a table games shift manager. At trial, Alford explained that she had Christou's permission to access his email account where a particular address list was saved. Also, in his email to Pilant after their meeting, Plaintiff explained that he had given another employee his login and password information so that she could email a report to the shift managers. No evidence was introduced to show that Plaintiff suffered an adverse employment action as a result of sharing his login and password information.

The Court heard testimony from two of Plaintiff's co-workers at the Grand, Josie Tam and Clinton Blayde. Tam began working at the Grand in 1996. In February 2007, Plaintiff

6

prepared a satisfactory evaluation for Tam, but Pilant directed Plaintiff to alter the evaluation to unsatisfactory so that it would result in Tam's termination. Plaintiff complied because he felt like his job depended on it. Tam was subsequently placed on an action plan and then terminated in July 2007 for allegedly failing to complete the action plan. Tam was fifty-three years old at the time of her termination and was replaced by Chris Griffin, who was in his mid-thirties. At trial, Pilant denied telling Plaintiff to alter Tam's evaluation. The Court finds that Plaintiff was the more credible witness.

Blayde was also placed on an action plan in February 2007 and terminated the following May for allegedly failing to complete the action plan. He was fifty-two years old at the time of his termination and was replaced by Bill Lewis, who was in his mid-thirties. As a member of management, Blayde had experience disciplining employees. He corroborated Plaintiff's testimony that the Grand only terminated employees upon a first infraction if the incident involved theft or fighting; otherwise, the Grand employed a four step disciplinary process.

At the time of his resignation, Plaintiff was making $79,850.00 per year. Approximately three weeks after his resignation, Plaintiff obtained employment as a floor supervisor at Fitzgerald's Casino ("Fitzgerald's"). Plaintiff has had no disciplinary problems at Fitzgerald's and has consistently received satisfactory to above-satisfactory evaluations. His starting salary was $40,000.00. He received raises approximately every six months, first to $45,000.00, then to $50,000.00, and then to $55,000. At the time of trial, Plaintiff had been earning $65,000.00 since December 2008. Plaintiff was promoted to casino administrator at Fitzgerald's and promoted again to his current position, assistant table games shift manager. Plaintiff testified

that he had submitted seven resumes for higher paying jobs. Finally, Plaintiff is in good health and had intended to work at the Grand until age seventy-two to accumulate retirement savings.

## II.   PROCEDURAL HISTORY

On July 11, 2007, Plaintiff filed a Charge of Discrimination ("Charge") with the Equal Employment Opportunity Commission ("EEOC"). Plaintiff received a Notice of Right to Sue letter and on November 23, 2008 filed a Complaint in this Court alleging age discrimination in violation of Title VII and the ADEA and seeking compensatory and punitive damages. Plaintiff named the following five defendants: Harrah's Tunica Corporation ("HTC"), HET, GCI, HOC, and BLD. On July 28, 2009, the Court entered an order granting HTC and BLD's motions to dismiss but denying HET and HOC's motions to dismiss. On November 16, 2009, the Court entered an order granting GCI's motion to dismiss. As a result, HET and HOC are the only remaining defendants. On September 20, 2010, the Court denied Defendants' separate but essentially identical Motions for Summary Judgment asserting that they could not be held liable because they were neither Plaintiff's employer nor an integrated enterprise with Plaintiff's employer.

The Court held a two-day bench trial on December 20-21, 2010. At the close of Plaintiff's proof, Defendants moved for judgment on partial findings pursuant to Rule 52(c) of the Federal Rules of Civil Procedure, asserting that Plaintiff failed to establish by a preponderance of the evidence that HET was either his employer or an integrated enterprise with his employer and reasserted its motion for summary judgment in that regard. The Court reserved ruling on HET's Rule 52(c) motion and has decided those issues herein.

### III. CONCLUSIONS OF LAW

####   A.   Employer Status

The ADEA makes certain employment practices unlawful. See 29 U.S.C. §§ 621 et seq. As a preliminary matter, a plaintiff bringing suit under the ADEA must demonstrate that the defendant is the plaintiff's employer. This determination focuses on whether the defendant falls under the ADEA's definition of "employer," 29 U.S.C. § 630(b), and whether an employment relationship existed between the plaintiff and the defendant. See Lilley v. BTM Corp., 958 F.2d 746, 750 (6th Cir. 1992). Under the ADEA, "[t]he term 'employer' means a person engaged in industry affecting commerce who has twenty [20] or more employees for each working day in each of twenty [20] or more calendar weeks in the current or preceding calendar year[.]" 29 U.S.C. § 630(b). The determination of whether an employment relationship existed involves an examination of whether the alleged employer had the authority to make key management decisions and exercised control over the manner and means of the plaintiff's work. Sutherland v. Mich. Dept. of Treasury, 344 F.3d 603, 612 (6th Cir. 2003).[6]

Plaintiff was informed by letter in 2006 that Harrah's had acquired the Grand. Plaintiff was not in contact with BLD from that point forward. Accordingly, after Defendants acquired the Grand, employees received an "HOC" employee handbook and W-2s listing HOC as their employer. Defendants' witnesses and employees at the Grand, Pilant and Young, considered themselves employees of HET as evinced by their LinkedIn pages. Although Young testified that the employees at the Grand worked for "the property," she admitted on cross-examination that "HOC" appears on the Grand's W-2 forms and its employee handbook, and Pilant testified

---

[6]Although Sutherland is a Title VII case, "the provisions of the ADEA generally receive an identical interpretation to corresponding provisions of Title VII." Lilley, 958 F.2d at 746.

that "Harrah's" oversaw the Grand. Finally, Plaintiff testified that he supervised up to 100 employees on any given day. The Court therefore finds that Defendants meet the definition of "employer" under the ADEA and that Plaintiff was their employee.

In so holding, the Court rejects Defendants' argument that BLD was Plaintiff's direct employer and that the Court should therefore apply the analysis proffered in Swallows v. Barnes & Noble Books Stores, Inc. for determining whether a parent corporation can be held liable for the discriminatory acts of its subsidiary. 128 F.3d 990 (6th Cir. 1997). All of the evidence presented at trial speaks to an employment relationship between Plaintiff and Defendants. The fact that BLD directly owned the property where the alleged discriminatory conduct took place does not, without more, support the conclusion that an employment relationship existed between Plaintiff and BLD. Absent evidence to support the conclusion that an employment relationship existed between Plaintiff and BLD, the Court concludes that application of the Swallows analysis is inappropriate in this case.

### B.   Prima Facie Case

To establish a violation of the ADEA, the plaintiff has only to prove that age was a determining factor in the decision to terminate his or her employment. Chappell v. GTE Prod. Corp., 803 F.2d 261, 266 (6th Cir. 1986). Plaintiff may make this showing with either direct or circumstantial evidence.[8] Geiger v. Tower Auto., 579 F.3d 614, 620 (6th Cir. 2009) (citing Gross v. FBL Fin. Serv., 129 S. Ct. 2343, 2351 (2009)). In cases such as this where the

---

[8]"[D]irect evidence [of discrimination] is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp., 176 F.3d 921, 926 (6th Cir. 1999). Unlike indirect evidence, "direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group." Johnson v. Kroger Co., 319 F.3d 858, 865 (6th Cir. 2003); see also Grizzell v. City of Columbus, 461 F.3d 711, 719 (6th Cir. 2006) (explaining that direct evidence "proves the existence of a fact without requiring an inference").

plaintiff's ADEA claim is based principally on circumstantial evidence, the Sixth Circuit has employed the framework articulated in McDonnell Douglas Corp. v. Green. 411 U.S. 792 (1973). Pursuant to that framework, the plaintiff must first establish a prima facie case. Id. at 802. Under the ADEA, proof of a prima facie case requires a showing by a preponderance of the evidence 1) that the plaintiff was at least forty (40) years old at the time of the alleged discrimination, 2) that he was subjected to an adverse employment action, 3) that he was otherwise qualified for the position, and 4) that he was replaced by a younger worker. Tuttle v. Metro. Gov't of Nashville and Davidson Cnty., 474 F.3d 307, 317 (6th Cir. 2007); Rowan v. Lockheed Martin Energy Sys. Inc., 360 F.3d 544, 547 (6th Cir. 2004).

Defendants concede that Plaintiff has met his prima facie case. Plaintiff was fifty-eight years old at the time of his separation from the Grand and suffered an adverse employment action when he was asked to resign in lieu of termination. Plaintiff had been employed in the casino industry since the 1970s and was quickly reemployed after his resignation in essentially the same position at Fitzgerald's. At the time of trial, Plaintiff had worked at Fitzgerald's for almost four years without incident. Moreover, Pilant testified that Plaintiff was qualified for the position of table games shift manager. Finally, Plaintiff was replaced by Mitch Pate, who was in his mid-thirties and therefore younger than Plaintiff.

### C.    Legitimate, Non-Discriminatory Reason and Pretext

Once a plaintiff establishes a prima facie case, the burden shifts to the defendant to present a legitimate, non-discriminatory reason for the plaintiff's termination. See Reeves v. Sanderson Plumbing, Inc., 530 U.S. 133, 142 (2000). The defendant "need only produce admissible evidence which would allow the trier of fact rationally to conclude that the

11

employment decision had not been motivated by discriminatory animus." Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 257 (1981). Defendants contend that they terminated Plaintiff because he forwarded a work email from Alford's account to his personal account in violation of the Grand's policies relating to computer use. Plaintiff admits forwarding the subject email. Defendants have identified specific policies that encompass Plaintiff's conduct, and Pilant testified that he could no longer trust Plaintiff after this incident. Based on this evidence, the Court finds that Defendants have met their burden of demonstrating a legitimate, non-discriminatory reason for Plaintiff's termination.

Once a defendant satisfies its burden, the burden shifts back to the plaintiff to demonstrate that the defendant's proffered reason for terminating the plaintiff is merely pretextual. Id. "A plaintiff can demonstrate pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." Dews v. A.B. Dick Co., 231 F.3d 1016, 1021 (6th Cir. 2000); Tuttle, 474 F.3d at 319 (quoting Tisdale v. Fed. Express Corp., 415 F.3d 516, 529 (6th Cir. 2005)). The Sixth Circuit has held that "the reasonableness of an employer's decision may be considered to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation." Wexler v. White's Fine Furniture, Inc., 317 F.3d 564, 576 (6th Cir. 2003). Plaintiff has offered proof to the effect that Defendants' proffered reason for his termination was merely pretext.

In the Court's view, Pilant's decision to terminate Plaintiff upon his first infraction in over ten years of employment with the Grand was unreasonable and inconsistent. Plaintiff, Young, and Blayde testified that the Grand generally followed a four step disciplinary process,

12

and the evidence presented does not support the conclusion that Plaintiff's conduct was serious enough to justify deviating from this process. To the contrary, employees did not receive training or instructions on how to use the Grand's computer system. Neither Pilant nor Alford appeared to be familiar at trial with the policies that Defendants cite as justification for Plaintiff's termination. Furthermore, the proof shows that it was not uncommon for employees to use each other's email accounts, and presumably each other's passwords on the shared work computer, without fear of suffering any disciplinary action. Moreover, Young testified that when an employee commits a serious infraction, his or her termination report shows that the employee is *not* eligible for rehire, but Pilant designated Plaintiff "eligible for rehire." Finally, there is no conclusive evidence that the Standards for Use that Plaintiff signed in 2001 were even in effect at the time of his termination almost six years later.

Plaintiff also presented evidence that Defendants were actually motivated by Plaintiff's age. First, comments referencing age discrimination can be considered when assessing whether an employer's reason for terminating an employee is pretextual. See Tuttle, 473 F.3d at 320 (quoting Talley v. Bravo Pitino Rest., 61 F.3d 1241, 1248 (6th Cir. 1995)). Plaintiff testified that Pilant asked him how old he was during a meeting of shift supervisors approximately six months prior to Plaintiff's forced resignation. Although Pilant denied making this statement at trial, his credibility was undermined by inconsistencies in his testimony including his statement that he did not work for HET, even though he listed HET as his employer on his LinkedIn profile. Furthermore, Plaintiff testified that he prepared a satisfactory evaluation for Tam in February 2007 but that Pilant told Plaintiff to alter it so that it would result in Tam's termination. Both Tam and Blayde, who were members of the protected class, were placed on action plans in early

13

2007 and subsequently terminated for their alleged failure to complete their action plans. Plaintiff, Tam, and Blayde were all replaced by younger individuals.

In short, the proof supports the conclusion that Plaintiff's termination was not in fact related to his conduct but was motivated by his age and the salary he earned as a combined result of his age and tenure. The Court therefore finds that Plaintiff has proven by a preponderance of the evidence that Defendants' proffered reason did not actually motivate his termination and was mere pretext for an unlawful action. Accordingly, the Court finds for Plaintiff on his age discrimination claim.

### E. Damages

#### i. Back Pay

Where a plaintiff proves that he was discharged because of his age in violation of the ADEA, he is entitled to recover back pay lost as a proximate result of the violation. Wheeler v. McKinley Enters., 937 F.2d 1158, 1162 (6th Cir. 1991). At the time of his termination on March 16, 2007, Plaintiff was making $79,850.00 per year or $1,535.57 per week. He became employed approximately three weeks later. Thus, for the period of time during which Plaintiff was unemployed because of Defendants' violation of the ADEA, Plaintiff is entitled to a back pay award in the amount of $4,606.71.

Plaintiff also is entitled to back pay from the date of his re-employment until the present. Plaintiff's starting salary at Fitzgerald's was $40,000.00 per year, approximately $39,850.00 less than his salary at the time he resigned from the Grand, representing a difference in pay of $19,925.00 over the first six month period. In his second six month period, Plaintiff earned $45,000.00 per year, approximately $34,850.00 less than his ending salary at the Grand,

14

representing a difference in pay of $17,425.00 over that six month period. In his third six month period, Plaintiff earned $50,000.00 per year, approximately $29,850.00 less than his ending salary at the Grand, representing a difference in pay of $14,925.00 over that six month period. In his fourth six month period, Plaintiff earned $55,000.00 per year, approximately $24,850.00 less than his ending salary at the Grand, representing a difference in pay of $12,425.00.00 over that six month period. In December 2008, Plaintiff's salary at Fitzgerald's increased to $65,000.00 per year, approximately $14,850.00 less than his ending salary at the Grand. Defendant's salary remained at $65,000 through the time of trial approximately two years later, representing a difference in pay of $29,700.00 over that period. Based on this proof, Plaintiff is entitled to an award of $94,400 for back pay since the date of his re-employment.

Plaintiff is therefore entitled to a total combined back pay award of $99,006.71, which represents the period of time during which he was unemployed and the period of time since the date of his re-employment.[10]

### ii. Front Pay

Front pay is an available form of equitable relief in ADEA actions. Roush v. KFC Nat. Mgmt. Co., 10 F.3d 392, 398 (6th Cir. 1993).[11] An award of front pay is guided by the consideration of certain factors, including available employment opportunities, the employee's work and life expectancy, the discount tables to determine the present value of future damages,

---

[10] Although a plaintiff has a duty to mitigate damages, a wrongdoer carries the burden of establishing that damages were lessened or might have been lessened by the plaintiff. Jones v. Consolidated Rail Corp., 800 F.2d 590, 593-94 (6th Cir. 1986). Defendants offered no evidence tending to show that Plaintiff failed to mitigate his damages.

[11] The Court recognizes that reinstatement is the presumptively favored equitable remedy in ADEA actions. Id. The Sixth Circuit has held, however, that reinstatement is not appropriate in every case, including a case such as this where the plaintiff has found other work. Id. Moreover, Plaintiff has not requested reinstatement, nor have Defendants presented evidence suggesting that they have offered reinstatement or that reinstatement is a viable remedy. See id.

15

and any other factors pertinent to prospective damages awards. Shore v. Fed. Express Corp., 777 F.2d 1155, 1160 (6th Cir. 1985). In awarding front pay, the Court does not consider future pay raises, nor does it apply a discount rate. Jackson, 31 F.3d at 1361.

At the time of trial, Plaintiff was earning $65,000 at Fitzgerald's, approximately $14,850.00 less than his salary at the time he resigned from the Grand. Plaintiff was promoted to casino administrator at Fitzgerald's and promoted again to his current position, assistant table games shift manager. As discussed above. Plaintiff has received periodic pay raises during his time at Fitzgerald's. Defendants presented no evidence that Plaintiff has intentionally limited his income. To the contrary, Plaintiff testified that he had submitted seven resumes for higher paying jobs. Plaintiff testified that he intended to work in his position at the Grand until age seventy-two.

Plaintiff was fifty-eight at the time of his termination and was sixty-one at the time of trial, which would entitle him to eleven years of front pay. Plaintiff is therefore entitled to a front pay award in amount of $163,350.00 (11 years of front pay x $14.850.00 difference in annual salary).

### iii. Liquidated Damages[12]

A plaintiff is entitled to recover liquidated damages for "willful" violation of the ADEA. 29 U.S.C. § 626(b). Liquidated damages are recoverable in an amount equal to the award of back pay. Wheeler, 937 F.2d at 1164. The Sixth Circuit has held that "willful" violations of the

---

[12] Plaintiff's complaint seeks compensatory and punitive damages. (D.E. #1.) Plaintiff is not entitled to recover punitive damages under the ADEA. See 29 U.S.C. §§ 216(b), 626(b); Ahlmeyer v. Nevada Sys. of Higher Ed., 555 F.3d 1051, 1059 (9th Cir. 2009). The Court construes Plaintiff's claim for punitive damages as a claim for liquidated damages. See Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 128 (1985) ("[L]iquidated damages are punitive in nature.").

ADEA are those that occur where "the employer knew or showed reckless disregard for the matter of whether its conduct was prohibited by the ADEA." Trans World Airlines, Inc., 469 U.S. at 128. In such cases, an employer may avoid a liquidated damages award by showing that it had a good faith and reasonable basis for believing that its conduct was not in violation of the ADEA. Id. at 128 n.22

Plaintiff testified that he was instructed to change a good performance evaluation into a poor performance evaluation for the purpose of placing Tam on an action plan. Plaintiff, Tam, and Blayde had all worked at the casino since it opened or shortly thereafter and were members of the protected class. Plaintiff, Tam, and Blayde were each replaced by younger individuals. Although Pilant and Young testified that these actions were taken without regard to age, the Court finds that these witnesses were not credible.

The preponderance of the evidence in this case supports the conclusion that, upon acquiring the Grand, Defendants implemented policies and procedures aimed at providing a pretext for the termination of Plaintiff and other employees who fell within the class protected by the ADEA. The Court finds that Plaintiff's termination was motivated, not by his forwarding of an email, but by his age and his salary. At a minimum, Defendants acted with reckless disregard for whether their conduct violated the ADEA. As such, Plaintiff is entitled to recover liquidated damages for Defendants' willful violation of the ADEA in an amount equal to his back pay award.

## IV. CONCLUSION

Based on the foregoing, the Court finds for Plaintiff John Branson. It is hereby **ORDERED** that Defendants pay to Plaintiff back pay in the amount of $99,006.71, front pay in

the amount of $163,350.00, and liquidated damages in the amount of $99,006.71. Plaintiff is entitled to a total judgment in the amount of $361,363.42. Pursuant to 29 U.S.C. § 216(b), Plaintiff, as the prevailing party, may file a motion with the Court for attorney's fees and costs supported by proper documentation within fifteen days of the entry of this order. Defendants shall have fifteen days following the filing of Plaintiff's motion to respond. Judgment shall be entered accordingly.

**IT IS SO ORDERED** this the 3rd day of June, 2011.

                                          <u>s/Bernice B. Donald</u>
                                          **BERNICE B. DONALD**
                                          **UNITED STATES DISTRICT JUDGE**